23 A.3d 496

NICK DEBENEDETTO, PLAINTIFF, v.
DENNY'S, INC., DEFENDANT.

Superior Court of New Jersey
Law Division
Middlesex County

Decided April 23, 2010.

*Andrew R. Wolf (Galex Wolf, LLC* ; attorneys), and *Michael Quirk (Williams Cuker Berezofsky* ; attorneys) of the Texas bar, admitted pro hac vice, argued the cause for Plaintiff, Nick DeBenedetto.

*Lauren E. Handler (Porzio Bromberg & Newman, P.C.*; attorneys) and *Scott Elder (Alston & Bird, LLP* ; attorneys) of the Georgia bar, admitted pro hac vice, argued the cause for Defendant, Denny's, Inc.

HAPPAS, P.J.S.C.

## I. Introduction

This opinion addresses defendant Denny's, Inc.'s ("Denny's") motion to dismiss plaintiff Nick DeBenedetto's ("DeBenedetto") second amended class action complaint ("second amended complaint"). On November 10, 2009, this court dismissed plaintiff's first amended class action complaint ("first amended complaint") without prejudice for failure to state a claim [1] and afforded plaintiff leave to file an amended complaint. On December 7, 2009, plaintiff filed his second amended complaint. Defendant has now moved to dismiss plaintiff's second amended complaint for failure to state a claim.

DeBenedetto's second amended complaint alleges violations of the New Jersey Consumer Fraud Act ("CFA").[2] Specifically,

---

[1] The court set forth its reasons on the record after hearing oral argument on November 10, 2009.

[2] Plaintiff's first amended complaint also included a second count for breach of the implied warranty of merchantability, which was omitted from his second amended complaint.

DeBenedetto claims that Denny's "deceptively presents" menu items without disclosing that its meals contain "excessive" amounts of sodium. Although greatly pared down from his first amended complaint,[3] DeBenedetto's second amended complaint contains several allegations regarding the dangers of sodium and the levels of sodium contained in Denny's meals. In particular, DeBenedetto alleges that:

- According to the Centers for Disease Control and Prevention (CDC), about 70 percent of American adults fall into categories of people who should consume no more than 1,500 mg of sodium each day ... [and] to achieve these maximum intake levels, most of the remaining 30 percent of adults should limit their sodium intake as well.

- The amount of sodium in a typical meal is extraordinarily high, especially compared to the advised daily limit of 1,500 mg of sodium for most American adults. The daily limit means that an individual's average main meals should have no more than 500 to 1,000 mg of sodium each.

- *Not one single* Denny's meal ... contains less than 500 mg of sodium. On the other hand, at *least 75 percent* of those meals contain more than the maximum amount of sodium most American adults should consume in an entire day.

- Despite knowledge of the large amounts of sodium in its menu items and despite knowledge that many New Jersey consumers choose to limit their sodium intake, Denny's continues to produce, market and sell meals containing large amounts of sodium without disclosing this fact on its menus with the intent that New Jersey consumers continue to purchase these meals.

Additionally, in anticipation of the arguments previously advanced by Denny's in its motion to dismiss DeBenedetto's first amended complaint, DeBenedetto's second amended complaint expressly disclaims any personal injury damages. Specifically, DeBenedetto's second amended complaint states that he "neither alleges nor seeks personal injury or any other form of damages ..." and his claim is "limited strictly to equitable relief authorized

---

[3] Among others, DeBenedetto's second amended complaint omits the following allegations that were included in his first amended complaint:

- Sodium is the deadliest ingredient in the food supply.
- Epidemiologists have found that populations that consume high levels of sodium suffer high rates of hypertension.
- Experts ... estimate that reducing sodium levels in processed and restaurant foods by 50 percent would save 150,000 lives each year.
- Excessive sodium intake [poses a] grave harm.

by [the CFA]." Accordingly, DeBenedetto solely alleges economic damages under the CFA, including a refund of the purchase price of the meals he consumed and treble damages. In addition, DeBenedetto seeks a declaratory judgment that Denny's practices violate the CFA and an injunction requiring Denny's to disclose on its menus the amounts of sodium in its meals.

## II. Motion to Dismiss Standard

Denny's brings its motion pursuant to *Rule* 4:6–2(e), contending that DeBenedetto's second amended complaint fails to state a claim upon which relief may granted. In addressing a motion to dismiss brought pursuant to *Rule* 4:6–2(e) a court's "inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint." *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 746, 563 *A.2d* 31 (1989). However, the court must search the complaint " 'in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary.' " *Ibid.* (quoting *Di Cristofaro v. Laurel Grove Mem'l Park*, 43 *N.J.Super.* 244, 252, 128 *A.2d* 281 (App.Div.1957)). "Every reasonable inference is therefore accorded the plaintiff[.]" *Pressler, Current N.J. Court Rules*, comment 4.1.1 on *R.* 4:6–2(e) (2010); *see also N.J. Sports Prods., Inc. v. Bobby Bostick Promotions, LLC*, 405 *N.J.Super.* 173, 177, 963 *A.2d* 890 (Ch.Div.2007).

In *Banco Popular North America v. Gandi*, 184 *N.J.* 161, 165, 876 *A.2d* 253 (2005), the Court expressed the standard on such motions:

> At this preliminary stage of the litigation [a] [c]ourt [should not be] concerned with the ability of the plaintiffs to prove the allegation contained in the complaint . . . [P]laintiffs are entitled to every reasonable inference of fact. The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.
>
> [internal citations omitted.]

Thus, such motions are granted "only in the rarest of instances." *Printing Mart–Morristown, supra*, 116 *N.J.* at 772,

563 *A*.2d 31. "The plaintiff's obligation in order to defeat a motion to dismiss is 'not to prove the case but only to make allegations, which, if proven, would constitute a valid cause of action.'" *Schulman v. Wolff & Samson, P.C.*, 401 *N.J.Super.* 467, 473–74, 951 *A*.2d 1051 (App.Div.) (quoting *Leon v. Rite Aid Corp.*, 340 *N.J.Super.* 462, 472, 774 *A*.2d 674 (App.Div.2001)), *certif. denied*, 196 *N.J.* 600, 960 *A*.2d 395 (2008).

By the same token, however, "[a] complaint may be dismissed for failure to state a claim if it fails 'to articulate a legal basis entitling plaintiff to relief.'" *Hoffman v. Hampshire Labs, Inc.*, 405 *N.J.Super.* 105, 112, 963 *A*.2d 849 (App.Div.2009) (quoting *Sickles v. Cabot Corp.*, 379 *N.J.Super.* 100, 106, 877 *A*.2d 267 (App.Div.) (internal citations omitted), *certif. denied*, 185 *N.J.* 297, 884 *A*.2d 1267 (2005)). Obviously, "if the complaint states no basis of relief and discovery would not provide one, dismissal is the appropriate remedy." *Banco Popular, supra*, 184 *N.J.* at 166, 876 *A*.2d 253. Specifically, "[a] motion to dismiss 'may not be denied based on the possibility that discovery may establish the requisite claim; rather, the legal requisites for plaintiff's claim must be apparent from the complaint itself.'" *N.J. Sports Prods., Inc., supra*, 405 *N.J.Super.* at 178, 963 *A*.2d 890 (quoting *Edwards v. Prudential Prop. & Cas. Co.*, 357 *N.J.Super.* 196, 202, 814 *A*.2d 1115 (App.Div.), *certif. denied*, 176 *N.J.* 278, 822 *A*.2d 608 (2003)).

### III.   Plaintiff's CFA Claim is Subsumed by the Products Liability Act

The primary basis for Denny's motion to dismiss is that DeBenedetto's CFA claim is, in essence, a products liability claim for which the New Jersey Products Liability Act ("PLA"), *N.J.S.A.* §§ 2A:58C–1 to –11, affords an exclusive remedy. For the following reasons, the court opines that DeBenedetto's CFA claim is subsumed by the PLA.

In 1987 the Legislature enacted the PLA based on an "urgent need for remedial legislation to establish clear rules with respect to certain matters relating to actions for damages for

harm caused by products." *N.J.S.A.* 2A:58C–1a. Shortly after the PLA was enacted, the New Jersey Supreme Court declared that "[t]he Legislature intended ... to limit the liability of manufacturers so as to 'balance [ ] the interests of the public and the individual with a view towards economic reality.'" *Zaza v. Marquess & Nell, Inc.,* 144 *N.J.* 34, 47–48, 675 *A.*2d 620 (1996) (quoting *Shackil v. Lederle Labs.,* 116 *N.J.* 155, 188, 561 *A.*2d 511 (1989)). A products liability action is defined as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." *N.J.S.A.* 2A:58C–1b(3). Accordingly, the PLA is the exclusive remedy for harms caused by a product.

The New Jersey Supreme Court's decision in *In re Lead Paint Litig.,* 191 *N.J.* 405, 924 *A.*2d 484 (2007) is instructive on the issue of whether a CFA claim is subsumed by the PLA.[4] In *Lead Paint,* twenty-six municipalities and counties sought to recover, from manufacturers and distributors of lead paints, the costs of detecting and removing lead paint from homes and buildings, of providing medical care to residents affected with lead poisoning, and of developing programs to educate residents about the dangers of lead paint. *Id.* at 408–09, 924 *A.*2d 484. Although the complaints initially sought recovery through a wide variety of legal theories, the Court was called upon to consider only whether the plaintiffs had stated a cognizable claim based on the common law tort of public nuisance. *Id.* at 409, 924 *A.*2d 484. The Supreme Court held that the PLA encompasses "virtually all possible causes of

---

[4] DeBenedetto suggests that the New Jersey Supreme Court's decision in *Lemelledo v. Beneficial Mgmt. Corp. of America,* 150 *N.J.* 255, 696 *A.*2d 546 (1997) controls here. In *Lemelledo,* the Court addressed the issue of whether a State regulatory scheme effectively preempted the CFA in a "loan packing" claim brought against a commercial lender. *Id.* at 259–60, 696 *A.*2d 546. Here, however, the Court is presented with the issue of whether the PLA, a statute that contains an exclusive remedy provision, supersedes DeBenedetto's CFA claims. This is precisely the issue presented in *Lead Paint* and its progeny.

action relating to harms caused by consumer and other products."
*Id.* at 436–37, 924 *A*.2d 484.

The essence of the claims asserted by the plaintiffs in *Lead Paint* was that the defendants failed to warn of the dangers of lead paint. *Id.* at 437, 924 *A*.2d 484. The Court noted that the harms plaintiff was seeking to vindicate are addressed in the context of a products liability claim:

> Were there any doubt about the essential nature of the claims asserted by plaintiffs, a careful reading would demonstrate that they sound in products liability causes of action. The central focus of plaintiffs' complaints is that defendants were aware of dangers associated with lead—and by extension, with the dangers of including it in paint intended to be used in homes and businesses—and failed to warn of those dangers. This classic articulation of tort law duties, that is, to warn of or to make safe, is squarely within the theories included in the PLA. In light of the clear intention of our Legislature to include all such claims within the scope of the PLA, we find no ground on which to conclude that the claims being raised by plaintiffs, regarding an ordinary household product used by consumers, were excluded from the scope of that Act.
>
> [*Ibid.* (internal citations omitted).]

Similarly, in *McDarby v. Merck & Co.*, 401 *N.J.Super.* 10, 96–99, 949 *A*.2d 223 (App.Div.2008), the Appellate Division relied upon *Lead Paint* to vacate an award of out-of-pocket expenses, treble damages, and attorneys fees under the CFA because the plaintiffs' PLA claims subsumed their CFA claims. *McDarby* involved an appeal from a $15.7 million judgment on claims of product liability and consumer fraud arising from Merck's sale of the prescription drug Vioxx. The plaintiffs were able to recover additional economic loss pursuant to the CFA as a result Merck's alleged "unconscionable" commercial practices. *Id.* at 96, 949 *A*.2d 223. In overturning the award, the *McDarby* observed that "[a]s in *Lead Paint* plaintiffs' own arguments make it clear that what they are asserting is, at its core, that Merck failed to warn of dangers from a product of which it had knowledge, resulting in alleged economic harm to them." *Id.* at 97, 949 *A*.2d 223. The court further noted that the

> essential effect of recognition of a cause of action for the fraudulent withholding of safety information such as that espoused by plaintiffs pursuant to the CFA—a cause of action that likely would be available to most product liability plaintiffs

claiming a failure to warn—would be to permit an award of attorneys fees in the majority of product liability actions without Legislative authorization for such relief. We find no warrant for such action.

[*Id.* at 98, 949 *A.*2d 223.]

Shortly after *McDarby,* the New Jersey Supreme Court again addressed the issue of whether the CFA is subsumed by the PLA in *Sinclair v. Merck & Co.,* 195 *N.J.* 51, 948 *A.*2d 587 (2008). *Sinclair* involved a products liability action in which the plaintiff sought to recover the costs of medical monitoring without alleging a physical injury. The Court concluded that

[t]he language of the PLA represents a clear legislative intent that, despite the broad reach we give to the CFA, the PLA is paramount when the underlying claim is one for harm caused by a product. The heart of plaintiffs' case is the potential for harm caused by Merck's drug. It is obviously a product liability claim. Plaintiffs' CFA claim does not fall within an exception to the PLA, but rather clearly falls within its scope. Consequently, plaintiffs may not maintain a CFA claim.

[*Id.* at 66, 948 *A.*2d 587.]

Thus, consistent with *Lead Paint* and *McDarby,* the Court concluded that a plaintiff may not avoid the requirements of the PLA by asserting his claim as a CFA claim. *Sinclair, supra,* 195 *N.J.* at 54, 948 *A.*2d 587.

In the instant case, DeBenedetto seeks economic losses equal to the amount of money he spent on those meals that he would not have purchased had the sodium content been properly disclosed to him. DeBenedetto further states in his complaint that he "neither alleges nor seeks personal injury or any other form of damages ..." However, DeBenedetto's second amended complaint sets forth that: (1) DeBenedetto "has hypertension" and that he takes medication "to treat his hypertension and high blood pressure ..."; (2) DeBenedetto "would not have purchased Moons Over My Hammy, or any other meal with 1,500 mg of sodium, if Denny's had disclosed this information to him at the point of sale"; (3) "The amount of sodium in a typical meal is extraordinarily high, especially compared to the advised daily limit of 1,500 mg of sodium for most American adults"; (4) "*Not one single* Denny's meal ... contains less than 500 mg of sodium ... [and] at least 75 percent of those meals contain more than the maximum amount of

sodium most American adults should consume in an entire day." Indeed, DeBenedetto fails to identify any reason other than health concerns for avoiding excessive consumption of sodium. There would be no reason for DeBenedetto to have included these allegations in his second amended complaint if the essence of his complaint is not that he either suffered a physical injury or allegedly was put at risk of a physical injury from consuming food purchased at Denny's.[5]

In addition, DeBenedetto specifically incorporated into his second amended complaint a publication from the United States Centers for Disease Control and Prevention ("CDC").[6] Among other statements, that document provides that: (1) "Greater consumption of sodium can increase the risk for hypertension;" (2) "Hypertension increases the risk for heart disease and stroke ... the first and third leading causes of death in the United States;" and (3) "[H]ealth-care providers should inform their patients of the evidence linking greater sodium intake to higher blood pressure." [7] Thus, despite DeBenedetto's assertion to the contrary,

---

[5] DeBenedetto's creative use of labels in an attempt to downplay the underlying reason behind his decision to forgo salty foods—that excessive sodium intake is dangerous—was evident during oral argument:

> THE COURT: Do you agree that your amended complaint still alleges that sodium is dangerous, and it causes increased risk of physical injury?
> MR. WOLF: I don't believe that it alleges that. I think it's in there as a fact that is ... common knowledge ...
> THE COURT: Do you ... agree that your amended complaint still sets forth that sodium is dangerous, and it causes an increased risk of physical injury?
> MR. WOLF: I believe it says that, Your Honor.

[6] "In evaluating motions to dismiss, courts consider 'allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.' " *Banco Popular North Am., supra,* 184 *N.J.* at 183, 876 *A.*2d 253 (citing *Lum v. Bank of Am.,* 361 *F.*3d 217, 222 n. 3 (3d Cir.), *cert. denied.,* 543 *U.S.* 918, 125 *S.Ct.* 271, 160 *L.Ed.*2d 203 (2004)).

[7] *See* C. Ayala, et al., Div for Heart Disease and Stroke Prevention, National Center for Chronic Disease Prevention and Health Promotion, *Application of Lower Sodium Intake Recommendations to Adults—United States,* 1999–2006,

his complaint is replete with allegations that sodium is dangerous and that it causes an increased risk of physical injury.

Further, a close reading of DeBenedetto's second amended complaint reveals that the essential nature of his allegations is that despite having knowledge of the detrimental effects of high levels of sodium, Denny's continues to market meals containing excessive sodium. Stated differently, the core of DeBenedetto's allegation is that Denny's has misrepresented the safety of its products by failing to warn plaintiff of its dangers. Indeed, DeBenedetto specifically alleges that "the Denny's restaurant menu deceptively presents various items as single meals to be consumed by one individual without disclosing that these meals contain substantially more sodium ... than the maximum recommended amount for all meals consumed by an individual in an entire day." "This classic articulation of tort law duties, that is, to warn of or to make safe, is squarely within the theories included in the PLA." *Lead Paint, supra,* 191 *N.J.* at 437, 924 *A.*2d 484. Accordingly, because the core of DeBenedetto's second amended complaint is that Denny's failed to adequately warn consumers of the dangerous levels of sodium in its meals, his exclusive remedy is the PLA.

DeBenedetto argues at length that the instant matter is distinguishable from the *Sinclair* and *McDarby* cases because both cases involved claims by persons who ingested the prescription drug Vioxx and then asserted claims based on the actual or increased risk of physical injury suffered as a result of ingesting Vioxx. DeBenedetto contends that because he seeks relief based solely upon economic losses he sustained in purchasing, rather than consuming, Denny's meals, the CFA should not be subsumed by the PLA. DeBenedetto's analysis, however, unduly limits the holdings in *Sinclair* and *McDarby*.

---

available at http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5811a2.htm?s_cid=mm5811a2_e (last visited July 12, 2011).

In *McDarby* the Appellate Division reversed the trial court's decision to allow recovery for the purchase price of a product pursuant to the CFA, reasoning that "[a]lthough the cause of action under the CFA asserted by plaintiffs in the present matter differs from the public nuisance theory espoused by the plaintiffs in the *Lead Paint* litigation, we can discern no reason to distinguish the two actions on that ground." *McDarby, supra,* 401 *N.J.Super.* at 97, 949 *A.*2d 223. Thus, the label plaintiff gives to the cause of action does not control whether it is subsumed by the PLA. In the present matter, as in *McDarby,* the alleged entitlement to damages depends on an underlying allegation that the product at issue puts customers at increased risk of injury—in *McDarby* the plaintiffs sought to recover the costs of the product (medication), and here, DeBenedetto seeks to recover the costs of the product (food). The court is simply not persuaded that DeBenedetto's strategic omission of an express allegation of personal injury renders *McDarby* inapplicable to this case. Moreover, the *Lead Paint* Court found that the plaintiff's nuisance claim was subsumed by the PLA despite the fact the plaintiffs did not include an underlying PLA count. *See In re Lead Paint, supra,* 191 *N.J.* at 409, 436–39, 924 *A.*2d 484. These opinions are consistent with the PLA, which defines a products liability action to include harms caused by products "irrespective of the theory underlying the claim." *N.J.S.A.* 2A:58C–1b(3).

DeBenedetto additionally relies on *Strawn v. Canuso,* 140 *N.J.* 43, 657 *A.*2d 420 (1995). In *Strawn,* the Court held that a builder-developer of new homes had a duty to disclose to prospective buyers that the homes were constructed near an abandoned hazardous-waste dump under the CFA. *Id.* at 48–49, 657 *A.*2d 420. DeBenedetto maintains that, like the plaintiff in *Strawn,* he is alleging that a seller (Denny's) concealed material information about a product (the sodium levels in its food) that would affect the health and safety of a buyer (DeBenedetto). However, *Strawn* was decided pre-*Lead Paint, McDarby,* and *Sinclair,* and therefore does not address the main issue before the court—

whether the PLA subsumes plaintiff's CFA claim.[8]  Accordingly, the fact that a pre-*Lead Paint, Sinclair,* and *McDarby* case held that a seller had a duty to disclose information in a real estate transaction has no bearing on whether the alleged harm from a food product is actionable under the CFA.

DeBenedetto similarly suggests that *Real v. Radir Wheels, Inc.,* 198 *N.J.* 511, 969 *A.*2d 1069 (2009), would permit his claim to survive.  *Radir Wheels* involved an out-of-state buyer of an automobile by way of an Internet auction filing a CFA action against an in-state seller.  *Id.* at 514, 969 *A.*2d 1069.  The defendant seller argued that the CFA claim should be dismissed because the allegations should properly have been brought under New Jersey's Used Car Lemon Law.  *Id.* at 525–26, 969 *A.*2d 1069.  The trial court ruled that the CFA was a proper avenue for plaintiff to pursue his claims and denied the defendant's motion to dismiss. *Id.* at 526, 969 *A.*2d 1069.  However, the *Radir Wheels* Court specifically noted that the Used Car Lemon Law provides that "[n]othing in this act shall in any way limit the rights or remedies which are otherwise available to a consumer under any other law." *Ibid.* Moreover, the Court acknowledged that "by its own explicit terms, the Used Car Lemon Law was never intended to substitute for the CFA; on the contrary, it is additive, intended to supplement the CFA's 'rights and remedies.'" *Ibid.* This language is in direct contrast to the PLA, which is intended to be "the sole source of remedy for plaintiffs' defective product claim ..." *Sinclair, supra,* 195 *N.J.* at 66, 948 *A.*2d 587.  In light of these

---

[8] In addition, the Legislature explicitly superseded the holding in *Strawn. See Nobrega v. Edison Glen Assoc.,* 167 *N.J.* 520, 534, 772 *A.*2d 368 (2001) (holding that the "Disclosure Act prospectively precludes plaintiffs from suing sellers and developers of real estate under the Consumer Fraud Act for failure to disclose off-site conditions, provided that the sellers and developers satisfy their disclosure obligations under Section 8 and 9 of the Act."). Thus, notwithstanding the fact that *Strawn* did not address the real issue before this Court, the Supreme Court has effectively limited its holding to comply with a subsequent Legislative enactment.

differences between the PLA and the Used Car Lemon Law, *Radir Wheels* is inapposite to DeBenedetto's position.

DeBenedetto's reliance on *Alloway v. Gen. Marine Indus., L.P.*, 149 *N.J.* 620, 695 *A.*2d 264 (1997) is also misplaced. *Alloway* involved an exception to the rule that the PLA subsumes products liability-based CFA claims. In *Alloway*, the plaintiff filed suit following the sinking of a boat and sought recovery for the economic loss to the boat itself under tort-based theories. *Alloway, supra*, 149 *N.J.* at 624, 695 *A.*2d 264. The plaintiff, however, did not allege that anyone sustained personal injuries. *Ibid.* After a thorough review of both state and federal law, the Court concluded that the plaintiff's tort claims were barred. *Id.* at 642, 695 *A.*2d 264. The Court reasoned that "[b]y providing for express and implied warranties, [the] U.C.C. amply protects all buyers—commercial purchasers and consumers alike—from economic loss arising out of the purchase of a defective product." *Ibid.* DeBenedetto contends that in light of the Court's recognition of the separate functions of tort law and contract and consumer protection law, there is no basis for finding a conflict between the application of the CFA and the PLA.[9] However, *Alloway* explicitly did not "resolve the issue [of] whether tort or contract law applies to a product that poses a risk of causing personal injuries or property damage but has caused only economic loss to the product itself." *Id.* at 639, 695 *A.*2d 264. Indeed, unlike the instant case, which, at a minimum, involves allegations that a product poses potential health risks, there was no allegation in *Alloway* that the

---

[9] In support of this proposition, DeBenedetto cites the following passage:

The New Jersey Products Liability Law (the "Law") is to the same effect. Although the Law excludes physical damage to the product itself from the definition of "harm," the Legislature did not intend to codify in the Law all common-law remedies. Consequently, the exclusion of physical damage from harm that falls within the Law is not dispositive. Additionally, the Legislature has adopted the Consumer Fraud Act, which provides generous protection to defrauded consumers.

[*Alloway, supra*, 149 *N.J.* at 640–41, 695 *A.*2d 264(internal citations omitted)].

boat posed a risk of personal injury. *Id.* at 624, 695 *A.*2d 264. Further, the very question that the Court in *Alloway* declined to resolve was addressed subsequently in *Lead Paint, Sinclair,* and *McDarby*—all of which, in this court's opinion, suggest that De-Benedetto's claims are subsumed by the PLA.

Ultimately, DeBenedetto's strategic decision to exclude personal injury allegations from his second amended complaint does not change the fact that his complaint, at its core, alleges that Denny's failed to warn him of the inherent dangers of consuming excessive amounts of sodium. Indeed, DeBenedetto's second amended complaint again alleges that sodium is dangerous and that it carries an increased risk of injury, allegations that fit squarely within the exclusive purview of the PLA. Further, DeBenedetto has acknowledged repeatedly that he suffered no physical injury as a result of purchasing and consuming food at Denny's.[10] Thus, insofar as DeBenedetto concedes that his injury is purely economic, his claims cannot survive.[11]

---

[10] The assertion of a claim pursuant to the PLA is premised upon a requisite level of harm, including: (a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph. *N.J.S.A.* 2A:58C–1(b)(2). Harm, for purposes of the PLA, does not include pure economic loss. *N.J.S.A.* 2A:58C–1(b)(2).

[11] In light of this ruling, the court will not address Denny's argument that DeBenedetto has failed to state a claim under the CFA. However, notwithstanding the court's opinion that DeBenedetto's claims are subsumed by the PLA, the court is doubtful that DeBenedetto has sufficiently alleged the requisite "unlawful conduct" to state a claim under the CFA. Although his arguments are colorable, it is unlikely that the Legislature intended the specific CFA provisions cited by plaintiff to apply to the sodium content contained in a restaurant's menu items. To hold otherwise is to suggest that virtually every restaurant in America commits consumer fraud every day.

Moreover, the New Jersey Legislature repeatedly has declined to enact legislation seeking the same relief sought here by DeBenedetto. On January 17, 2011, *N.J.S.A.* 26:3E–17 became effective, requiring restaurants to disclose the caloric content of foods they sell, but does not require them to disclose the sodium content. The Legislature specifically chose not to enact a version of

## IV.  Conclusion

The allegations set forth in DeBenedetto's second amended complaint are based on a theory of products liability;  thus, DeBenedetto's CFA claims are subsumed by the PLA. The PLA requires physical injury to sustain a claim and DeBenedetto contends that he has suffered no physical injury as a result of purchasing and consuming food at Denny's.  Thus, since there is no basis by which DeBenedetto can remedy his deficient pleading, his claims are dismissed with prejudice.

---

the legislation which would have required restaurants to divulge the sodium content.  For this court to effectively impose such a requirement, as suggested by DeBenedetto, would clearly contravene legislative authority.